UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| TIMOTHY A. BENNETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 2:16CV12 PLC |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Timothy Bennett seeks review of the decision of the Social Security Commissioner, Nancy Berryhill, denying his applications for Supplemental Security Income and disabled widower's benefits under the Social Security Act.[2] Because the Court finds substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's applications.

*I.    Background and Procedural History*

In October 2012, Plaintiff filed applications for Supplemental Security Income and widower's insurance benefits alleging he was disabled as of July 1, 1996 as a result of: degenerative disc disease; "left shoulder injury with limited range of motion"; "undiagnosed pulmonary problems"; anxiety; depression; chronic pain; infection in teeth and gums; and acid

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 9).

1

reflux. (Tr. 72, 166-71, 172-73, 174-80). The Social Security Administration (SSA) denied Plaintiff's claims, and he filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 107-11, 114-18, 121-22).

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing on July 31, 2014. (Tr. 31-70). At the hearing, Plaintiff testified that he was fifty-two years of age, had a ninth grade education, and had neither a GED nor vocational training. (Tr. 37, 40). Plaintiff had sole custody of his nine-year-old daughter. (Tr. 38, 55).

Plaintiff stated that his shortness of breath and back pain prevented him from working. (Tr. 40). He last worked as a painter in the late 1990's, but stopped after he fell "and broke the ball off my shoulder and my arm was froze[n] for a couple of years there because I couldn't move my arm. . . . and then my wife became ill, I had to – to stay and take care of her until she passed." (Tr. 41). Plaintiff did not resume work after his wife died in October 2000 because he "was in a bad depression there for a while and then I ended up getting married again and I was living off what was left of the life insurance and my…my back was really bothering me and my shoulder." (Id.).

Plaintiff testified that, on a typical day, he helped his daughter get ready for school. (Tr. 42). After she boarded the school bus, he took his medicine and tried "to keep the…place tidy as I can." (Tr. 42). He met his daughter's teachers at the beginning of the school year and if she "has something at the school I go up to it." (Tr. 43). He stated that he "sometimes" watched television and "can barely read." (Id.). When the ALJ asked what he and his daughter "like to do together," Plaintiff answered that she "likes to…read to me" and they played board games and went to the park. (Tr. 44).

2

Plaintiff stated he was able to dress and shower by himself. (Tr. 45). He prepared mostly microwaveable food and swept the floors. (Tr. 45, 47). He drove his car to the grocery store about twice a month and shopped for thirty minutes to an hour. (Tr. 45-46). Plaintiff usually used disposable plates and plasticware because he "can't stand that long" and clean dishes. (Tr. 46). Plaintiff's brother took care of his yard and picked up his and his daughter's laundry once a week. (Tr. 46-47). Plaintiff had not smoked cigarettes "in over two months." (Tr. 47). Prior to quitting, he was smoking about half a pack of cigarettes per day. (Tr. 48).

Plaintiff took Xanax, Percocet, and heart burn medication, and he used inhalers. (Tr. 48). Plaintiff believed his medications "help some of the pain," but they also "make me drowsy." (Tr. 48). Plaintiff stated that he had suffered "problems with my back for 15-20 years but it just got worse" in the last five or six years. (Tr. 49-50). When the ALJ questioned Plaintiff about injections for back pain, Plaintiff explained, "My doctor is 84 years old and he's not, you know, he's – I just go in there. He does my blood pressure. He gives my [sic] medicine and he sends me out." (Tr. 50). According to Plaintiff, he had not changed doctors because he "tried and nobody wants to take Medicaid[.]" (Id.). The only restriction placed upon him by his doctor was that he "not [] pick up anything heavy. . . . I think less than 25 pounds or whatever." (Tr. 52).

Plaintiff stated that, for the last few months, his leg was "going numb from my knee down to my foot" and the problem was "getting worse and worse." (Tr. 52). Plaintiff stated that he could sit or stand for twenty to thirty minutes at a time and "can't lift much at all." (Tr. 53-54). Plaintiff was not seeing a mental health professional, but took Xanax, which "helps calm down this – the bolts that I get." (Tr. 53).

When Plaintiff's counsel asked him whether he had been diagnosed with lung cancer, Plaintiff recounted a visit to the hospital during which a doctor informed him that "both of my

3

lungs were spotted" and scheduled surgery, which he refused to undergo. (Tr. 56). Plaintiff explained, "I watched my family members, my uncles, my dad all die of cancer" and he believed that surgery hastened their deaths. (Id.). Plaintiff had difficulty breathing when walking short distances. (Tr. 57). When his counsel inquired about his left shoulder, he stated "I can't reach it above my head[.]" (Tr. 58). Plaintiff testified that his pain interfered with his sleep and he generally slept about three hours per night. (Tr. 60).

A vocational expert also testified at the hearing. (Tr. 62-70). The ALJ asked the vocational expert to consider a hypothetical individual with the same age and education as Plaintiff and the ability to perform light work with the following limitations: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; occasionally reach with the left upper extremity; avoid concentrated exposure to extreme heat, extreme cold, vibrations, and hazards such as dangerous machinery and unprotected heights; occasional exposure to respiratory irritant. (Tr. 62-63). The ALJ added that the hypothetical individual "is able to understand, remember and carry out simple instructions consistent with unskilled work involving tasks that can be demonstrated and do not require reading and writing to perform." (Tr. 63). The vocational expert testified that such person could perform the jobs of assembler/small products II, garment sorter, and folding machine operator. (Tr. 64).

When the ALJ added to the hypothetical the limitations to "unskilled work in which there are no strict production quotas. . . . In other words, work by the shift and not by the hour," the vocational expert stated this would eliminate the bench assembler position. (Tr. 65). However,

the vocational expert testified that the hypothetical individual could perform the job of photocopying machine operator.³ (Tr. 66).

In a decision dated August 21, 2014, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920⁴ and found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from July 1, 1996, through the date of this decision[.]" (Tr. 16-26). The ALJ found that Plaintiff had the following "severe combination of impairments: chronic obstructive pulmonary disease (COPD); thoracic spondylosis; depressive disorder, NOS; anxiety; and an unspecified learning disorder." (Tr. 16).

After reviewing Plaintiff's testimony and medical records and finding that Plaintiff was "not entirely credible," the ALJ determined that Plaintiff had the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567 and 416.967(b) except that he can only occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; is limited to occasional reaching overhead, in front, and laterally, with the left upper extremity; must avoid concentrated exposure to extreme heat, extreme cold, vibration, and hazards such as dangerous machinery and unprotected heights; is limited to no more than occasional exposure to respiratory irritants such as fumes, odors, dust, gases, and poor ventilation; is able to understand, remember, and carry out simple instructions consistent with unskilled work, where there are no strict production quotas and the individual wouldn't be subject to the demands of fast-paced production work, i.e., work by the shift, not by the hour.

---

³ The vocational expert testified that there were approximately 50,000 photocopying-machine operator positions in the national economy and 1,000 in Missouri. (Tr. 66). In regard to the other positions, he stated there were approximately 27,500 garment sorter positions in the national economy and 715 in Missouri, and 75,500 garment sorter positions in the national economy and 1,510 in Missouri. (Tr. 64).

⁴ To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

(Tr. 20). Finally, the ALJ found that Plaintiff had no past relevant work but that there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 25-26).

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on January 5, 2016. (Tr. 1-4). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. *Standard of Review*

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that

a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### III. *Discussion*

Plaintiff claims that substantial evidence did not support the ALJ's finding that he was not disabled because: (1) the vocational expert did not identify jobs that Plaintiff was capable of performing; and (2) the ALJ improperly assigned greater weight to the opinion of the state agency medical consultant than those of an examining physician and treating specialist. Defendant counters that: (1) the vocational expert's testimony was consistent with the Dictionary of Occupational Titles (DOT) and Plaintiff's RFC; and (2) the ALJ properly weighed the medical opinion evidence.

#### A. *Vocational expert testimony*

Plaintiff argues that the vocational expert's testimony did not support the ALJ's finding at step five of the sequential analysis that Plaintiff was capable of performing a significant number of jobs in the national economy. (ECF No. 18 at 9-11). More specifically, Plaintiff contends that a person with the limitations included in his RFC could not perform the occupations identified by the vocational expert because, according to the DOT, those jobs require Level 2 reasoning. In response, Defendant contends that the RFC did not limit Plaintiff to Level 1 reasoning jobs and there is no conflict between the limitations set forth in the hypothetical and the requirements of Level 2 reasoning. (ECF No. 23 at 4-7).

At step five of the sequential analysis, the burden shifts to the Commissioner to establish that the plaintiff maintains the RFC to perform a significant number of jobs in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). See also Singh v. Apfel, 222 F.3d

7

448, 451 (8th Cir. 2000). The Commissioner may satisfy her burden by eliciting testimony by a vocational expert based upon hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments.'" Jones v. Astrue, 619 F.3d 963, 971-72 (8th Cir. 2010) (quoting Hiller v. Soc. Security ., 486 F.3d 359, 365 (8th Cir. 2007)). "If there is an 'apparent unresolved conflict' between VE testimony and the DOT, the ALJ must 'elicit a reasonable explanation for the conflict' and 'resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than the DOT information." Moore v. Colvin, 769 F.3d 987, 989-90 (8th Cir. 2014) (quoting SSR 00-4p, 2000 WL 1898704, at *2-4 (Dec. 4, 2000)).

At the hearing, the ALJ presented to the vocational expert a hypothetical individual "able to understand, remember, and carry out simple instructions consistent with unskilled work in occupations where there are no strict production quotas and the individual would [not] be subject to the demands of fast[-]pace production work." (Tr. 65). The ALJ testified that such an individual could perform the jobs of garment sorter, folding machine operator, and photocopying machine operator. (Tr. 64, 66). The ALJ relied upon the vocational expert's testimony at step five of the sequential analysis when she found that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 26).

According to the DOT, the three jobs identified by the vocational expert require Level 2 reasoning, or the ability to "[a]pply commensense understanding to carry out detailed but uninvolved written or oral instructions." DOT 222.687-014 (garment sorter); DOT 208.685-014 (folding-machine operator); DOT 207.685-014 (photocopying-machine operator). See also Moore v. Astrue, 623 F.3d 599, 604 (8th Cir. 2010). Plaintiff maintains that there is a conflict

8

between the requirements of Level 2 reasoning and the limitations contained in the ALJ's hypothetical – namely, an ability to "understand, remember, and carry out simple instructions."

In Moore v. Astrue, the Eighth Circuit considered an almost identical issue and held that there was "no direct conflict between 'carrying out simple job instructions' for 'simple, routine and repetitive work activity,' as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate." 623 F.3d at 604. The court further noted that "the Level 2 reasoning definition is an upper limit across all jobs in the occupational category, not a requirement of every job within the category." Id. "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the *DOT*." Id. (quoting Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000)). The court concluded: "Because substantial evidence supports the ALJ's phrasing of the hypothetical to the vocational expert, and there was no conflict between the vocational expert's testimony and the *DOT*, the ALJ properly relied on the testimony." Id. (citing Page v Astrue, 484 F.3d 1040, 1045 (8th Cir. 2007)). See also Fleming v. Colvin, Case No. 4:15CV1150 SPM, 2016 WL 4493683, *10 (E.D.Mo. Aug. 26, 2016).

Here, the restriction in the hypothetical ("understand, remember, and carry out simple instructions") is nearly identical to the restriction in Moore ("carrying out simple job instructions" for "simple routine and repetitive work activity"). As in Moore, the ALJ here neither limited Plaintiff to Level 1 reasoning jobs nor included limitations that would preclude jobs requiring an ability to "carry out detailed but uninvolved written or oral instructions." Moreover, as in Moore, nothing in the record suggests that the vocational expert ignored the reasoning limitations in the hypothetical when she identified potential jobs that an individual with Plaintiff's RFC could perform. Finally, the vocational expert testified that there were no

9

conflicts between the evidence she provided and the occupational information in the DOT. (Tr. 65, 66). Based on the above, the Court concludes that substantial evidence supported the ALJ's determination at step five of the sequential analysis.

B. *Medical opinion evidence*

Plaintiff argues that substantial evidence did not support the ALJ's RFC determination because the ALJ improperly assigned greater weight to the opinion of a state agency medical consultant than the opinions of an examining physician and treating specialists.[5] Defendant counters that the ALJ properly considered the medical opinions, as well as other evidence in the record as a whole, and provided good reasons for the weight she assigned the medical opinions.

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In determining a claimant's RFC, the ALJ is required to consider the medical opinion evidence of record together with the other relevant evidence. 20 C.F.R. §§ 404.1527(b), 416.927(b). Unless the ALJ assigns controlling weight to a treating physician's opinion, the ALJ must explain the weight given to every medical opinion of record, regardless of its source. See 20 C.F.R. §§ 404.1527(c), (e)(2)(ii); 416.927(c), (e)(2)(ii). When determining the appropriate amount of weight to give a medical opinion from a non-treating source, the ALJ considers the following factors: examining relationship, treatment relationship, supportability, consistency, and specialization. Wiese v. Astrue, 552 F.3d 728, 731 (8th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with

---

[5] Although Plaintiff faults the ALJ for assigning insufficient weigh to the medical opinion of his "treating specialists," he identifies only one specialist – Dr. Barron, the orthopedist whom Plaintiff saw twice in July 2014. (ECF No. 18 at 12-14). Moreover, the record contains only Dr. Barron's treatment notes and no medical opinions regarding Plaintiff's restrictions or ability to perform work-related functions.

the record as a whole." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Because the ALJ weighs each medical opinion in light of the entire record, the Court will summarize the relevant medical evidence. The records reflects that Plaintiff saw his primary care physician, Dr. Ubaldo Rodriguez, on a monthly basis for check-ups and prescriptions refills from September 2008 through May 2014, and that Plaintiff consistently complained of back and/or neck pain and anxiety and/or depression. (Tr. 257-312, 396-413). In August 2011, Dr. Rodriguez ordered lumbar x-rays, which revealed mild degenerative disc disease at L3-L4. (Tr. 314).

In November 2012, Plaintiff underwent a pulmonary function test at SSM St. Joseph Hospital West. (Tr. 321-25). The study showed: "evidence of a mild obstructive defect with a significant bronchodilator response. Lung volumes are normal. Diffusion studies are decreased disproportionately at 43% of predicted. The FEV1 is 93% of predicted." (Tr. 322).

On December 4, 2012, Dr. Dennis Velez performed a consultative physical examination for Plaintiff. (Tr. 328-37). Plaintiff reported "ongoing difficulty breathing for at least ten years." (Tr. 328). Plaintiff admitted that he "used to be a heavy smoker and has made attempts to cut back on his smoking,"[6] and he stated that his inhalers help control his symptoms. (Id.). Plaintiff also reported "ongoing back pain for at least ten years," and stated that "he has to stop frequently when he walks due to pain as well as shortness of breath." (Id.). He also experienced "pain down his legs at times, but denies that he has any weakness or loss of sensation." (Id.). Plaintiff denied "having had epidural injections, a trial of anti-inflammatories, bracing or surgical intervention." (Tr. 329).

---

[6] Plaintiff later admitted that he smoked about half a pack of cigarettes per day and "has cut back from three packs a day." (Tr. 330).

At that time, Plaintiff was taking Prilosec, Advair, Pro-Air, alprazolam, and hydrocodone. (Tr. 330). Dr. Velez observed that Plaintiff "appears to be in mild stress due to shortness of breath as he sits up during the exam table [sic] and shows evidence of air hunger. He has some cough during the examination." (Tr. 331). The examination of Plaintiff's lungs revealed "[w]heezing throughout both inspiratory and expiratory phases," "significant crackles at the bases," and "evidence of air hunger due to way that he was sitting, although he had no evidence of cyanosis." (Id.). Plaintiff had "slight hunched posture when he walks," but "[f]ull strength in both upper as well [as] lower extremities with only slight weakness of wrist extension in the left side when compared with the right." (Tr.332). A joint examination revealed "significant decreased range of motion as well as tenderness and crepitus in the left shoulder," "crepitus in both knees," "tenderness to palpation on the lumbosacral spine and [] disturbed rhythm on extension on the lumbar flexion and extension." (Tr. 333). Dr. Velez concluded that Plaintiff "would have limitations as far as walking more than [a] third of the time due to significant shortness of breath. He would not have any limitations as far as sitting and standing provided that he continues to take his inhalers. He would have limitations on lifting and carrying above 80 degrees with his left shoulder . . . . [He] should not have any verbal or written communications problems." (Tr. 334). Dr. Velez diagnosed: possible COPD; "possible left shoulder adhesive capsulitis vs. arthralgia"; and possible lumbar spondylosis. (Tr. 335).

X-rays of Plaintiff's spine taken on February 1, 2013 revealed "[n]ormal examination of the lumbar sacral spine." (Tr. 352). Chest x-rays from March 13, 2013, showed pulmonary hyperinflation and thoracic spondylosis, but were "[o]therwise unremarkable." (Tr. 354).

State agency medical consultant, Dr. John Jung, reviewed Plaintiff's medical records and function report, and he completed an RFC assessment for Plaintiff on March 14, 2013. (Tr. 80-

83). Dr. Jung found that Plaintiff could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; perform limited reaching with the left arm; and avoid exposure to extreme heat and cold, pulmonary irritants, and hazards. (Tr. 81-83). Dr. Jung explained that the limitations he identified were "appropriate for the MDI's of COPD, old trauma to left shoulder and his shortness of breath." (Tr. 99). Dr. Jung also discussed the results of the pulmonary performance test, which "were not listing level but did show evidence of mild obstructive defect with significant bronchodilator response," and noted that Plaintiff "alleges lung cancer in the past without treatment but there is no evidence of any lung cancer at this time." (Tr. 99).

Plaintiff underwent a series of x-rays on April 14, 2014. (Tr. 414-416). Images of Plaintiff's thoracic spine revealed "mild mid thoracic vertebral compressions"; "moderate thoracic spondylosis"; and "no acute vertebral compressions." (Tr. 414). X-rays of Plaintiff's lumbar and cervical spine showed "mild degenerative changes." (Tr. 415, 416).

On July 11, 2014, about three weeks prior to the July 31, 2014 administrative hearing, Plaintiff saw Dr. Mark Barron at the Missouri Orthopaedic Institute in Columbia, Missouri. (Tr. 417-19). Plaintiff complained of low back and neck pain, which he rated as seven out of ten, and he reported taking oxycodone three times per day. (Tr. 417). He also complained of numbness in his right foot and lower leg, numbness in his right hand and arm, and "legs giving out." (Tr. 417). Dr. Barron's physical examination of Plaintiff revealed: no acute distress, difficulty with ambulation and balance, adequate lumbar range of motion, diffuse weakness throughout his lower right extremity, decreased sensation in the dorsal part of his right foot, knee

pain on extension, and no pain with hip range of motion. (Tr. 418). Dr. Barron diagnosed: "low back, cervical pain; right upper and lower extremity radiculopathy" and ordered MRIs of Plaintiff's cervical and lumbar spine. (Tr. 418-19).

On July 11, 2014, x-rays of Plaintiff's cervical spine showed "mild spondylotic changes at C5-C6," and x-rays of his lumbar spine showed "mild facet arthrosis and early spondylotic changes." (Tr. 420, 421). MRIs of his cervical spine performed on July 25, 2014 revealed "no acute findings" and "[t]race C5-C6 retrolithesis with mild narrowing of the respective neural foramen." (Tr. 422). A lumbar spine MRI showed "no disc bulge, spinal canal stenosis or narrowing lateral recess" but there was "L4-5 and L5-S1 mild facet osteoarthritis." (Tr. 424). After reviewing the "[n]egative cervical and lumbar MRI[s]," Dr. Barron referred Plaintiff to a neurologist and stated: "There is no surgical intervention recommended." (Tr. 425).

   *1. Dr. Jung*

Plaintiff argues that the ALJ provided insufficient explanation for her conclusion that Dr. Jung's opinion was "consistent with the objective evidence as a whole" because "the only example given [by the ALJ] is a notation that the Plaintiff had 'good response to inhalers.'" (ECF No. 18 at 12). "[T]he opinions of nonexamining medical sources are generally given less weight than those of examining sources." Papesh v. Colvin, 786 F.3d 1126, 1133 (8th Cir. 2013) (quoting Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010)). When evaluating a non-examining source's opinion, the degree to which the opinion considers all of the pertinent evidence in the claim must be considered. Wildman, 596 F.3d at 967. "The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

In her decision, the ALJ summarized the treatment notes, clinical observations, and medical test results. In regard to the medical opinion evidence, the ALJ found that Dr. Jung's opinion was "well supported by a narrative explanation, which refers to the objective medical evidence. In particular, it noted the claimant's documented good response to inhalers, including in a pulmonary function report." (Tr. 24). The ALJ also found that Dr. Jung's opinion was "consistent with the medical evidence as a whole" and therefore assigned it "significant weight." (Tr. 24).

Here, the ALJ specifically cited the pulmonary function test as objective medical evidence supporting Dr. Jung's less restrictive opinion. (Tr. 24). Additionally, earlier in the decision, the ALJ cited objective medical evidence supporting the RFC, including: normal radiographs of Plaintiff's lumbar spine taken in February 2013; chest x-rays taken on March 21, 2013, which "demonstrated pulmonary hyperinflation and mild spondylitic changes in the thoracic spines" and "no other abnormalities"; and x-rays taken in April 2014, which showed "mild degenerative changes with small osteophytles" in the cervical spine, "only mild degenerative changes" in the lumbar spine, and "minimal anterior wedging at the T6, T7, and T8 vertebrae" and "[m]ild narrowing of several mid thoracic disc spaces" in the thoracic spine. (Tr. 22). The ALJ also cited x-rays and MRIs from July 2014, which showed "mild disc height loss at C5-C6," "mild spondylosis in the lumbar spine with mild retrolithesis at L3-L4, and no evidence of nerve compression. (Tr. 23). <u>See</u> <u>e.g.</u>, <u>Steed v. Astrue</u>, 524 F.3d 872, 875 (8th Cir. 2008) ("Even where [claimant's] diagnostic tests showed actual disc herniation or bulging, the diagnosis is tempered in several instances in the medical records by the words 'mild' or 'minimal' regarding either the herniation, or its effects."). Based on the above, the Court finds that the ALJ did not err in assigning Dr. Jung's opinion significant weight.

15

*2. Dr. Velez*

Plaintiff also challenges the ALJ's decision to assign Dr. Velez's opinion partial weight. (ECF No. 18 at 13-14). Plaintiff maintains that Dr. Velez's opinion was entitled to greater weight because it was based on a physical examination and was consistent with the observations of Dr. Barron, the orthopedist that treated Plaintiff twice in 2014.

In her decision, the ALJ assigned "partial weight" to Dr. Velez's medical opinion. (Id.). The ALJ explained that Dr. Velez's restrictions "are generally supported by his examination," but "the assessed restriction regarding the claimant's ability to walk appears to be inconsistent with the evidence in general, and the other restrictions assessed by Dr. Velez." (Id.).

The only aspect of Dr. Velez's opinion that the ALJ discredited was "the assessed restriction regarding the claimant's ability to walk[.]" (Tr. 24). The ALJ considered the walking restriction "inconsistent with the evidence in general, and the other restrictions assessed by Dr. Velez." (Id.). Although the ALJ did not specify what evidence contradicted Dr. Velez's walking restriction, she cited significant evidence that Plaintiff's impairments were less limiting than alleged. For example, the ALJ wrote: "[I]maging studies of the claimant's cervical and lumbar spine have revealed only minor degenerative changes with no evidence of nerve compression. Surgery was explicitly not recommended, and there is no evidence that other invasive treatment options, such as epidural steroid injections[,] have been considered or recommended." (Tr. 24). "[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion." Goff v. Barnhart, 421 F.3d 785, 790-91 (8th 2005).

The ALJ also noted that, while the pulmonary function testing conducted in November 2012 indicated "a mild obstructive defect and disproportionately decreased diffusion," Plaintiff "was noted to have a 'dramatic response' to bronchodilator treatment." (Id.). "If an impairment

16

can be controlled by treatment or medication, it cannot be considered disabling." Hensley v. Colvin, 829 F.3d 926, 933-34 (8th Cir. 2016) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)).

In addition to the medical evidence, the ALJ noted that Plaintiff's activities of daily living, which included driving, shopping, cooking, sweeping, and attending his daughter's school events, suggested he was less restricted than he alleged. (Tr. 25). The ALJ may discount opinions of physical limitations greater than Plaintiff exhibited in his daily life. See Turpin v. Colvin, 750 F.3d 989, 994 (8th Cir. 2014) (ALJ properly discounted opinion where it conflicted with the medical records, the testimony of a medical expert, and Plaintiff's account of her daily activities).

Importantly, the ALJ did not entirely discount Dr. Velez's opinion, but rather assigned it partial weight. Indeed, the ALJ's RFC assessment, which limited him to light work and provided additional exertional limitations, such as "occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds" and "occasionally reach overhead, in front, and laterally, with the left upper extremity," demonstrates that the ALJ did give some weight to this opinion evidence. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Furthermore, the Court notes that Dr. Velez did not limit Plaintiff to sedentary work. To the contrary, Dr. Velez stated that Plaintiff "would not have any limitations as far as sitting and standing provided that he continues to use his inhalers."

Finally, Plaintiff argues that there "is little medical evidence in the record that supports the ALJ's conclusion that [he] can perform light work on a continuing basis," and likens his case to Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). In Lauer, the United States Court of Appeals for the Eighth Circuit reversed the denial of benefits because the record contained no medical

evidence to support the ALJ's assessment of the degree to which the plaintiff's mental impairments affected his RFC. Lauer, 245 F.3d at 706. The instant case is distinguishable because the record contained a significant amount of objective tests, clinical findings, and opinion evidence that supported the ALJ's RFC determination.

Upon review of the record and the ALJ's decision, the Court finds that the ALJ evaluated all of the evidence of record and provided good reasons for the weight he accorded Dr. Jung's and Dr. Velez's opinions. Because substantial evidence on the record as a whole supports the ALJ's determination to assign significant weight to Dr. Jung's opinion and partial weight to Dr. Velez's opinion, the Court will not disturb that determination.

### IV. Conclusion

For the reasons discussed above, the undersigned finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED.**

A separate judgment in accordance with this Memorandum and Order is entered this date.

                                                                     /s/ Patricia L. Cohen
                                                           PATRICIA L. COHEN
                                                           UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of May, 2017